State of Wisconsin, Plaintiff-Respondent,

v.

Thomas G. Kramer, Defendant-Appellant.†

Court of Appeals

*No. 2005AP105–CR. Submitted on briefs January 19, 2006.
—Decided June 8, 2006.*

2006 WI App 133

(Also reported in 720 N.W.2d 459.)

† Petition to review denied 12-5-06.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Tim Provis*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James M. Freimuth*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Lundsten, P.J., Dykman and Higginbotham, JJ.

¶ 1. HIGGINBOTHAM, J. Thomas G. Kramer appeals a judgment of conviction for first-degree intentional homicide, attempted first-degree intentional homicide, and theft from a person or corpse. Kramer argues his conviction should be reversed and remanded for a new trial because (1) pretrial statements made by Kramer should have been suppressed because he invoked his Fifth Amendment right to counsel during a standoff with police prior to being in custody; (2) pretrial statements made by Kramer should have been suppressed because the State deliberately failed to electronically record the interrogations in which they were made; and (3) Kramer's constitutional right to present a defense was violated when testimony showing his mistrust and fear of local law enforcement was excluded. We reject Kramer's arguments and affirm.

## BACKGROUND

¶ 2. On March 12, 2003, the State filed a criminal complaint charging Kramer with first-degree intentional homicide, attempted first-degree intentional homicide, theft from a person or corpse, and the penalty enhancer of using a dangerous weapon in the commis-

sion of a crime. The charges arose from an incident occurring on March 7, 2003, in which Kramer was alleged to have shot and killed one police officer and shot at another officer over the course of a standoff after Kramer allegedly threatened a Town of Strongs Prairie crew attempting to trim trees on or near his property.

¶ 3. At trial, one of the members of the tree-trimming crew, Roland Rollie, testified that on March 6, 2003, his crew planned on trimming trees on the right-of-way in front of Kramer's property. Rollie testified that, before they were going to trim the trees, he talked with Kramer, who stated that he did not want any trees on his property cut and stated, "If you do, you'll be dead." Another crew member, Ronald Amell, testified that after he was told about this threat, he asked Kramer if he had indeed threatened to kill Rollie, and Kramer admitted he said that. Amell stated the crew worked on other trees that day, but came back the following day and observed Kramer repeatedly pacing his driveway. At one point Amell observed that Kramer was carrying a gun. Amell then called the sheriff's department.

¶ 4. After a few minutes, an officer, identified by Amell as Deputy Michael Shannon, arrived in a squad car with lights flashing. Kramer stood near his mailbox at the end of his driveway and was not carrying a gun. Deputy Shannon pulled up to Rollie, talked with him, and then drove toward Kramer, who started quickly walking away down the driveway. Amell testified Deputy Shannon got out of the squad car and stated repeatedly, "Tom, I need to talk to you." Kramer continued to briskly walk away and then stepped off into a wooded area on his property. Amell observed Kramer pick up a rifle and heard Deputy Shannon say, "Drop the

gun" while drawing his firearm. Amell then heard two nearly simultaneous shots fired and then a third as Deputy Shannon fell down. Deputy Shannon did not respond to Amell's questions of, "Officer, are you alright" but Kramer responded, "No, I shot him." Counsel stipulated into evidence the autopsy report, which stated Deputy Shannon's cause of death was a gunshot wound.

¶ 5. Adams County Sheriff's Department Chief Deputy Alexander Bebris testified that an estimated 100 officers from area counties were called in to form a perimeter around Kramer's property. A standoff ensued, with Kramer using Deputy Shannon's radio to contact the police. Police attempted to negotiate Kramer's peaceful surrender. After the radio's batteries died, police dropped a phone in front of Kramer's garage, while a team of four officers led by Juneau County Sheriff's Department Captain Steven Coronado positioned themselves on one side of the garage to assist in arresting Kramer when he came out for the phone. When Kramer came out to pick up the phone, he saw Coronado and fired at him. As Kramer fled around the garage, other officers intervened and arrested him.

## DISCUSSION

### I. Fifth Amendment Right to Counsel

¶ 6. Kramer contends that the statements he made while in police custody following the standoff must be suppressed under *Miranda*[1] and *Edwards*[2] because he requested an attorney during the standoff and police subsequently questioned him in the absence

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *Edwards v. Arizona*, 451 U.S. 477 (1981).

of counsel. Kramer does not address whether he was "in custody" within the meaning of *Miranda* when he requested counsel. Rather, he asserts that police were required to honor his request because it preceded police questioning. We disagree.

¶ 7. "The trial court's findings of evidentiary or historical facts will not be overturned unless clearly erroneous. However, questions of constitutional fact are subject to an independent appellate review and require an independent application of the constitutional principles involved to the facts as found by the trial court." *State v. Stearns*, 178 Wis. 2d 845, 849, 506 N.W.2d 165 (Ct. App. 1993) (citations omitted).

¶ 8. The Fifth Amendment to the United States Constitution[3] provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Fourteenth Amendment of the federal constitution requires state courts to observe this privilege against compelled self-incrimination. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). In

---

[3] Article I, section 8, subsection 1 of the Wisconsin Constitution also provides the right against self-incrimination. Historically, we have interpreted this provision to provide the same scope of protections as the Fifth Amendment to the United States Constitution. *See State v. Jennings*, 2002 WI 44, ¶ 39–42, 252 Wis. 2d 228, 647 N.W.2d 142. However, in *State v. Knapp*, 2005 WI 127, ¶ 73, 285 Wis. 2d 86, 700 N.W.2d 899, the Wisconsin Supreme Court departed from federal constitutional jurisprudence to expand the scope of the exclusionary rule under article I, section 8 to bar physical fruits obtained by a deliberate *Miranda* violation. Kramer does not develop an argument for why his statements should be excluded under Wisconsin's constitution.

*Miranda*, the United States Supreme Court recognized the right to have counsel present during custodial interrogation to safeguard the right against compulsory self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966); *see also Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981); *State v. Jennings*, 2002 WI 44, ¶ 26, 252 Wis. 2d 228, 647 N.W.2d 142. Police must cease questioning when an individual's *Miranda* right to counsel is invoked. *Edwards*, 451 U.S. at 482; *see also State v. Hassel*, 2005 WI App 80, ¶ 9, 280 Wis. 2d 637, 696 N.W.2d 270. Ensuing statements made in violation of the suspect's right to counsel are inadmissible. *See Edwards*, 451 U.S. at 487.

■

¶ 9. However, " 'the *Miranda* safeguards apply only to *custodial* interrogations.' " *Hassel*, 280 Wis. 2d 637, ¶ 9 (emphasis added) (quoting *State v. Pheil*, 152 Wis. 2d 523, 531, 449 N.W.2d 858 (Ct. App. 1989)); *see also State v. Armstrong*, 223 Wis. 2d 331, 344–45, 588 N.W.2d 606 (1999). Thus, unless a defendant is in custody, he or she may not invoke the right to counsel under *Miranda*.

¶ 10. Kramer argues that pretrial statements made by him in two interrogations following his arrest should have been suppressed because he had requested an attorney during the standoff. Kramer and a deputy sheriff had the following exchange over the radio during the standoff:

KRAMER: Have you arrested [the tree trimmers]?

DEPUTY: No, the [trimmers] have been taken from here. They're no longer here.

KRAMER: In jail?

DEPUTY: No, they're not in jail. Getting statements from them which we gotta get from you too.

KRAMER: Well, bring your paper up here. Get me an attorney.

DEPUTY: 10–9? I didn't hear you.

KRAMER: Bring me an attorney too.

DEPUTY: All right, when we're ready with the phone. I'll give you a call.

¶ 11. Kramer was not provided with an attorney during the standoff or later that day when he was arrested and taken into custody. Once in custody, Kramer was interrogated twice. Before both interrogations Kramer was read his *Miranda* rights and given a written *Miranda* form to review. Both times he waived his rights, including his right to counsel, and agreed to speak with agents.

¶ 12. Kramer contends his request for an attorney during the standoff served as a valid invocation of his Fifth Amendment right to counsel and therefore the admission at trial of statements he made in the subsequent interrogations violated *Edwards*. The State argues that this request for counsel was not made while Kramer was "in custody," and that a criminal defendant who is not in custody cannot anticipatorily invoke *Miranda* rights. Therefore, according to the State, his later statements made under interrogation were properly admitted. We agree with the State.

¶ 13. *Hassel* is dispositive here. In *Hassel* the defendant moved the court to suppress his post-*Mirandized* inculpatory statements made during a custodial interrogation. *Hassel*, 280 Wis. 2d 637, ¶¶ 3, 5. Hassel alleged that his pre-custodial statement "I can't talk to you," was a proper invocation of his right to silence under *Miranda*, and that therefore his ensuing incriminating statements made during custodial inter-

788

rogation should have been suppressed. *Id.*, ¶¶ 5, 8. Observing that *Miranda* safeguards apply only to custodial interrogations and that Hassel did not argue he was in custody when he invoked his right to silence, we concluded Hassel "was not entitled to invoke *Miranda*" during the pre-custodial interview with police. *Id.*, ¶¶ 9–10.

¶ 14. Applying the general rule in *Hassel* to this case, we conclude Kramer's pre-custody invocation of his right to counsel was not an invocation of his right to counsel under *Miranda* and therefore his ensuing post-*Mirandized* inculpatory statements made while undergoing custodial interrogation need not be suppressed. As in *Hassel*, Kramer does not dispute the State's assertion that he was not in custody when he asked the police to get him a lawyer. Arguments not refuted are generally deemed admitted. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). Moreover, Kramer does not suggest, and we cannot think of, any reason not to apply *Hassel* here. Instead, Kramer asserts, relying on *Smith v. Illinois*, 469 U.S. 91 (1984), that he could have anticipatorily invoked his right to counsel at any time during the "process." Kramer's reliance on *Smith* is misplaced, as that case does not address the non-custodial anticipatory invocation of a *Miranda* right.

¶ 15. Our holding here, however, is not meant to suggest that there are no exceptions to the general rule that a defendant may not anticipatorily invoke *Miranda*. For example, there might be situations where a request for counsel at the conclusion of a standoff situation is so intertwined with imminent interrogation that the invocation should be honored. That did not occur here.

## II. Electronic Recording

¶ 16. Kramer next argues that his statements made in the two interrogations should have been suppressed because law enforcement failed to make electronic recordings of the interrogations, even though the interrogation room was equipped with working video equipment. We disagree.

¶ 17. Kramer first argues that we should adopt a general exclusionary rule mandating the exclusion of statements made by adults during police interrogations if the interrogation is not electronically recorded. Kramer asserts we should impose this rule "based on the State's high court's supervisory power."[4] Kramer is asking us to extend to adults the rule established by the Wisconsin Supreme Court in *State v. Jerrell C.J.*, 2005

---

[4] The legislature recently enacted 2005 Wis. Act 60, §§ 31, 40, establishing the policy "to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony unless. a condition under section 972.115(2)(a)1. to 6. applies or good cause is shown for not making an audio or audio and visual recording of the interrogation." 2005 Wis. Act 60, § 31. The legislature enacted these provisions long after Kramer's interrogations in this case. Therefore, the relief provided in this act is not available to him. More specifically, the newly created Wis. Stat. § 972.115(2)(a) provides:

> If a statement made by a defendant during a custodial interrogation is admitted into evidence in a trial for a felony before a jury and if an audio or audio and visual recording of the interrogation is not available, upon a request made by the defendant as provided in s. 972.10(5) and unless the state asserts and the court finds that one of [certain] conditions applies or that good cause exists for not providing an instruction, the court shall instruct the jury that it is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony and that the jury may consider the absence of

WI 105, ¶¶ 47–59, 283 Wis. 2d 145, 699 N.W.2d 110, making inadmissible at trial some unrecorded statements made by juveniles during custodial interrogations. The supreme court in *Jerrell* established this rule pursuant to its broad superintending and supervisory authority over the court system granted to it under article VII, section 3 of the Wisconsin Constitution. The supreme court's supervisory or superintending authority is " 'as broad and as flexible as necessary to insure the due administration of justice in the courts of this state,' " and it includes the power to " 'control the course of ordinary litigation in the lower courts of Wisconsin.' " *Jerrell*, 283 Wis. 2d 145, ¶ 69 (Abrahamson, C.J., concurring).[5] In comparison, the Wisconsin Constitution grants this court supervisory authority "over all actions and proceedings in the courts in the district." WIS. CONST. art. VII, § 5(3).[6] Whatever the precise limits on our supervisory authority, Kramer fails to persuade us we have the authority to adopt the sort of sweeping new exclusionary rule he proposes.

¶ 18. Kramer next argues that the failure to record an interrogation of an adult is a violation of due process under both the United States and Wisconsin

an audio or audio and visual recording of the interrogation in evaluating the evidence relating to the interrogation and the statement in the case . . . .

[5] This issue was addressed and made part of the majority opinion. *State v. Jerrell*, 2005 WI 105, ¶ 61 n.16, 283 Wis. 2d 145, 699 N.W.2d 110.

[6] WISCONSIN CONST. art. VII, § 5(3) grants the court of appeals supervisory authority "over all actions and proceedings in the courts in the district." Kramer does not argue we have the authority under this constitutional provision to provide the relief he seeks. Rather, he assumes this court's authority is identical to that of the supreme court, which of course finds no support in our constitution or other legal authority.

Constitutions.[7] Kramer's due process argument relies on three cases: *Jerrell, State v. Scales*,[8] and *Stephan v. State*.[9] The first two, *Jerrell* and *Scales*, provide no support for Kramer's due process argument. Rather, both cases are examples of a state's highest court adopting a rule in its supervisory capacity, an issue we address above.

¶ 19. The other case Kramer relies on is the Alaska Supreme Court's decision in *Stephan*. However, Kramer merely cites *Stephan*; he does not provide a due process analysis and he does not respond to the State's detailed due process analysis.[10] Because Kramer's argument is insufficiently developed, we do not address its merits.

■

¶ 20. In summary, we reject Kramer's arguments. Kramer fails to persuade us we have the authority to

---

[7] The Fourteenth Amendment to the United States Constitution in pertinent part provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Article 1, section 1 of the Wisconsin Constitution provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." WIS. CONST. art. I, § 1.

[8] *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994).

[9] *Stephan v. State*, 711 P.2d 1156, 1159 (Alaska 1985).

[10] In addition to the State's due process analysis, the State points out that Alaska is a minority of one on this topic by virtue of the *Stephan* ruling that the Alaska Constitution requires custodial interrogations be recorded. *Stephan v. State*, 711 P.2d 1156, 1159 (Alaska 1985). The State cites to *State v. Cook*, 847 A.2d 530, 542 (N.J. 2004), which lists thirty-one other states that have rejected the proposition that the federal due process clause or analogous state constitutional provisions require electronic recording of adult interrogations.

grant the relief he seeks, and his due process argument is insufficiently developed to merit a response.

### III. Right to Present a Defense

¶ 21. Finally, Kramer argues that the trial court denied him his constitutional right to present a defense when it excluded testimony of Charles Roberts, a longtime friend of Kramer's. He contends that Roberts would have provided testimony supporting his imperfect self-defense theory that Kramer mistrusted and feared the local sheriff's department. The trial court excluded Roberts's testimony on the grounds that evidence of Kramer's fear and distrust of the Adams County Sheriff's Department was irrelevant to the issue of whether Kramer actually believed he faced great imminent danger or bodily harm and that it was necessary to use deadly force when he shot at Deputy Shannon and Captain Coronado. We need not decide whether the circuit court was in error by excluding Roberts's testimony because we conclude that, even assuming the court violated Kramer's right to present a defense, such error was harmless.

¶ 22. The right to present a defense is grounded in the confrontation and compulsory process clauses of the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Wisconsin Constitution[11] and includes the right to present the testimony of

---

[11] Article I, section 7 of the Wisconsin Constitution provides in relevant part: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face; [and] to have compulsory process to compel the attendance of witnesses in his behalf . . . ." WIS. CONST. art. I, § 7. The Sixth Amendment to the United States Constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . .

favorable witnesses. *See State v. Pulizzano*, 155 Wis. 2d 633, 645–46, 456 N.W.2d 325 (1990). Our determination of whether the State denied Kramer his right to present a defense is a question of constitutional fact that we determine independently of the circuit court. *State v. Shomberg*, 2006 WI 9, ¶ 26, 288 Wis. 2d 1, 709 N.W.2d 370.

¶ 23. At trial, Kramer asserted he acted in self-defense, and the jury was instructed on imperfect self-defense. A successful defense based on imperfect self-defense reduces first-degree intentional homicide to second-degree intentional homicide.[12] The test is subjective; a defendant must present "evidence of actual beliefs that [he] was in imminent danger of death or great bodily harm and that the force [he] used was necessary to defend [himself]." *State v. Head*, 2002 WI 99, ¶ 124, 255 Wis. 2d 194, 648 N.W.2d 413; *see also* Wis. Stat. § 940.01(2)(b) (2003–04).[13] A defendant may

---

to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI.

[12] Kramer's right to present a defense argument thus applies only to the homicide and attempted homicide charges and has no bearing on the theft from a person or corpse conviction.

[13] Wisconsin Stat. § 940.01 reads in pertinent part:

**First-degree intentional homicide. (1)** Offenses. (a) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

. . . .

**(2)** Mitigating Circumstances. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05:

use what is referred to as *McMorris*[14] evidence to establish a factual basis to support an imperfect self-defense claim. *Head*, 255 Wis. 2d 194, ¶ 122. This evidence may be relevant to a defendant's state of mind and whether the defendant actually believed that he was in imminent danger of death or great bodily harm, "or that [he] needed to use a given amount of defensive force to prevent or terminate the unlawful interference." *Id.*, ¶ 123.

¶ 24. Kramer sought to introduce Roberts's testimony concerning various conversations he had had with Kramer about various acts of misconduct and violence by members of the Adams County Sheriff's Department prior to March 7, 2003. In an offer of proof, Roberts testified about several incidents that caused him and Kramer to be concerned about the violent nature of the Adams County Sheriff's Department. The first incident took place a number of years prior to the shooting here when an Adams County deputy and an officer from another county conducted a traffic stop and allegedly shot and wounded a man. The second incident involved an Adams County deputy sheriff who pulled a gun on Roberts's mother-in-law. According to Roberts, his mother-in-law told him that she was holding a paring knife to cut asparagus when the deputy pulled his gun on her. The third incident concerned allegations

. . . .

(b) *Unnecessary defensive force.* Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[14] *McMorris v. State*, 58 Wis. 2d 144, 150, 205 N.W.2d 559 (1973).

made in federal criminal court that Adams County Sheriff Kenneth Bitsky abused jail inmates and intimidated a witness. Roberts and Kramer were aware of claims that Bitsky lied under oath to cover up the allegations. Finally, Roberts testified he and Kramer were concerned about certain Adams County deputies who "would be brought up on charges," were suspended with pay for several months, and then reinstated. According to Roberts, he and Kramer, in general, did not trust the Adams County Sheriff's Department.

¶ 25. Kramer argues that his right to present a defense was violated because the exclusion of Roberts's "crucial" testimony adversely affected his theory of imperfect self-defense. He argues that Roberts's testimony goes to Kramer's actual belief that the force he used was necessary, because this belief was based on his mistrust and fear of the members of the Adams County Sheriff's Department. Even assuming the court violated Kramer's right to present a defense by excluding this testimony, we conclude such error constituted harmless error.

¶ 26. The Supreme Court fashioned a "harmless-constitutional-error rule" in *Chapman v. California*, 386 U.S. 18, 22 (1967). The Court stated that although "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," not all "trial errors which violate the Constitution automatically call for reversal." *Id.* at 23. In *Crane v. Kentucky*, 476 U.S. 683, 691 (1986), the Court concluded that a violation of the right to present a defense is subject to harmless error analysis.[15] *See*

---

[15] In reaching this conclusion the Supreme Court, in summary fashion, referred to its earlier decision in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), where the Court extensively

*also United States v. Martin*, 369 F.3d 1046, 1059 (8th Cir. 2004). The *Chapman* court held that for a federal constitutional error to be held harmless, "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. Our inquiry, therefore, is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999); *see also State v. Harvey*, 2002 WI 93, ¶ 46, 254 Wis. 2d 442, 647 N.W.2d 189. "In other words, if it is 'clear beyond a reasonable doubt that a rational jury would have [rendered the same verdict] absent the error,' then the error did not 'contribute to the verdict,'" and is therefore harmless. *Hannemann v. Boyson*, 2005 WI 94, ¶ 57, 282 Wis. 2d 664, 698 N.W.2d 714 (quoting *Neder*, 527 U.S. at 15, 18).

¶ 27. Applying the harmless error analysis, we conclude it is clear beyond a reasonable doubt that the jury would still have found Kramer guilty of first-degree intentional homicide and attempted first-degree intentional homicide had it heard the excluded evidence. We have no doubt that the jury would not have relied on this evidence to find that Kramer subjectively thought he was in such great danger of death or great bodily harm that he needed to retrieve a weapon and fire it at the officers.

¶ 28. Roberts's proffered testimony regarding the traffic stop incident does not inform us whether the shooting was unjustified or without good cause.

---

analyzed the question of whether a Sixth Amendment challenge to a trial court's denial of a defendant's right to cross-examine a witness for bias is subject to harmless error analysis. *Id.* at 681–84.

Roberts's testimony on the second incident involving an officer pulling a gun on his mother-in-law lacks sufficient detail so as not to be helpful to the jury in determining whether Kramer acted in self-defense. And, like the first incident, Roberts offered no facts to assist the jury in determining whether the officer's conduct in pulling the gun on his mother-in-law was without good cause. Regarding conduct by Sheriff Bitsky, we are confident a reasonable jury would not have agreed with Kramer that the acts of one person, albeit the sheriff himself, represents how other officers in the department would act towards Kramer under the circumstances presented here.

¶ 29. Finally, Roberts's testimony does not suggest that Deputy Shannon or Captain Coronado were involved in any misconduct, or that Kramer had any knowledge that those officers had a reputation for violence.[16] Roberts's testimony instead focuses on encounters between other officers and third parties, at best evincing a more general feeling about the department as a whole rather than providing insight into Kramer's state of mind. Yet, even from this viewpoint, Roberts's own testimony indicates that he and Kramer agreed that a majority of the deputies were good people. Roberts stated, "[A] number of situations in the past years . . . that concerned us because the majority of our deputies are really class people, really good people, and we were kind of concerned." Regardless of whether exclusion of Kramer's proffered evidence constituted a

---

[16] Our conclusion here does not suggest that there are no circumstances under which a person should be permitted to admit evidence of mistrust and fear of a particular group as support for arguing imperfect self-defense against a member of that group.

denial of his right to present a defense, the error did not affect the verdict. Therefore, any error in excluding this testimony was harmless.

## CONCLUSION

¶ 30. We conclude pretrial statements made by Kramer were properly admitted because, under *Hassel*, non-custodial anticipatory invocation of the right to counsel need not be honored. We reject Kramer's request that we exercise supervisory authority to establish a rule requiring the suppression of evidence procured through non-recorded interrogations of adults. Finally, even assuming that the exclusion of Roberts's testimony violated Kramer's constitutional right to present a defense, we conclude such error was harmless. Accordingly, we affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.